# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

ZIGGY1 CORP., and ZIGGY2 CORP.,  )
                                 )
        Plaintiffs,            )
                                 )
vs.                              )    NO. CIV-15-0715-HE
                                 )
LORETTA LYNCH, *et al.*          )
                                 )
        Defendants.            )

## ORDER

This case arises out of law enforcement actions taken by the Drug Enforcement Administration ("DEA") and others[1] against certain smoke shops operating in Oklahoma. Businesses known generally as "Ziggy's" or "Ziggy's Smoke Shops" have operated in multiple locations in Oklahoma for many years. On April 22, 2015, the DEA seized a substantial portion of the inventory of those shops,[2] on the basis the seized property was "drug paraphernalia" used or acquired as a result of violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et. seq*. The seized items included various types of glass pipes, plastic pipes, rolling papers, scales, bongs, and similar items.

Plaintiffs here ("Ziggy1 Corporation" and "Ziggy2 Corporation") are newly created corporations, established after the April 22 seizure. Chelsey Davis appears to be the

---

[1] Agents of the Department of Homeland Security were apparently involved in the operation as well. However, for ease of reference and as it appears to make no difference for present purposes, this order refers to the various agents/agencies as the "DEA."

[2] The complaint alleges that six semitrailer loads of alleged paraphernalia were removed. Complaint [Doc. #1] at ¶ 35.

organizer and principal shareholder of these entities, and an officer of them.[3]  According to the plaintiffs, they were established as a vehicle to acquire the inventory of the various Ziggy's locations remaining after the seizure — what plaintiffs allege to be, or what Mr. Davis believed to be, the legal assets of the businesses — and to continue business operations under some variation of the Ziggy's name.  According to Mr. Davis, he operated an unrelated business near one of the Ziggy's locations, was acquainted with the owner/principal of the Ziggy's stores (Johnny Ren), and, soon after the seizure, negotiated a deal with Mr. Ren for acquisition of the remaining assets.  He indicates he began efforts, through the two plaintiff corporations, to re-staff the stores, establish relationships with the various landlords, and take other steps necessary to the operation of the stores.[4]

While the exact timing of subsequent events is somewhat uncertain, it appears that DEA became aware of efforts by Mr. Davis to continue the operations of the various smoke shop locations.  So far as appears from the current submissions to the court,[5] DEA made no effort to contact Mr. Davis directly or to challenge his operation of the various locations.

---

[3]*It is unclear at this point whether Mr. Davis is the sole shareholder of plaintiffs, and what role, if any, others may play in their operations as owners, officers, or otherwise.*

[4]*The purchase agreement with Mr. Ren or his entities was apparently oral rather than written, and involved an arrangement for acquisition of the assets based on 20% of their market or other value, with the purchase price to be determined and paid at some point in the future.  Mr. Davis description of the agreement was not detailed as to many aspects of it.*

[5]*This description is based on the complaint and on the evidence offered by plaintiffs at a hearing on their motion for preliminary injunction held July 28, 2015.  Defendants did not offer evidence at the hearing, instead limiting themselves to cross examination of plaintiffs witnesses, hence this description of the circumstances is largely plaintiffs uncontested (at this point) version of the facts.*

2

Rather, on May 19, 2015, the DEA's Assistant Special Agent in Charge (Richard W. Salter) sent letters to the landlords of the various Ziggy's locations, advising them that the DEA had received information "there is, or may be, probable cause to believe" that their leased premises were being used in violation of the Controlled Substances Act ("CSA"). The letters further stated that "the property has also been used, or is being used" to distribute synthetic marijuana and drug paraphernalia and that "continued use of this property to distribute synthetic cannabinoids and/or drug paraphernalia may further subject the property to forfeiture ...." The letters warned that continued use of the property in violation of federal law might result in the landlord's loss of "innocent owner" status under the law, loss of the property, and other serious consequences.[6]

Plaintiffs' evidence is that the various landlords then began heading for the exits. Notices to quit were served by some, and plaintiffs indicate several of the locations were shut down by the time of the preliminary injunction hearing. The responses of some of the landlords, through their counsel or other representatives, led to at least one meeting with the DEA and other agents at which Mr. Davis was present. He indicates he told the DEA he was seeking to sell only legal products through the businesses and that the inventory he acquired from Mr. Ren or his entities was the inventory not already seized by the DEA. Plaintiffs

---

[6]*The closing substantive paragraph reads: "Allowing the continued use of the property, in violation of federal law, may result in the loss of an 'innocent owner' status. In addition to the violation of federal law, this conduct may be creating a hazard to the public health and safety. Continued use of this property, in violation of federal law, may result in criminal prosecution, imprisonment, fines, and forfeiture of the property and appurtenance." The letter then identifies two investigators the landlord could contact if they wished to discuss the matter further.*

allege that Davis invited the various agents onto the properties to verify his claims, but they declined. He indicates he sought guidance from the agents as to what of the remaining inventory they viewed as drug paraphernalia and that they replied "all of it" or words to that effect.

Plaintiffs then filed this case seeking declaratory and injunctive relief.[7] Although the complaint's description of the various claims and relief sought is not entirely clear, it appears plaintiffs seek essentially the following: (1) a declaration that the Controlled Substances Act is unconstitutionally vague as applied to the plaintiffs, (2) a declaration stating whether the particular items and substances they are selling are or are not legal, and (3) injunctive relief preventing the defendants from instituting, or threatening to institute, forfeiture proceedings or other prosecution against the plaintiffs or their landlords.[8]

The court held a hearing on July 10, 2015, which it treated as a hearing on the motion for temporary restraining order ("TRO"). It granted plaintiffs' motion in part, enjoining defendants from pursuing any civil or other forfeiture proceedings, or issuing any further warnings or letters, directed at the landlords, pending a further hearing on the request for preliminary injunction. Order, July 10, 2015 [Doc. #10]. The order did not restrain any actions by the defendants directed to or at the plaintiffs, as opposed to the third-party landlords. At the July 28, 2015, preliminary injunction hearing, the court received evidence,

---

[7]*The defendants are the Attorney General of the United States, the Administrator of the DEA and Mr. Salter, the U.S. Attorney for this district, and various John Doe defendants.*

[8]*The relief sought in the complaint was characterized more narrowly, but the motion for preliminary injunction describes the injunctive relief sought to be as indicated.*

4

heard further argument from the parties, and continued the TRO in effect pending the court's decision on the request for preliminary injunction. In the meantime, defendants moved to dismiss this case on jurisdictional and other grounds. That motion is now also at issue.

The court concludes the motion to dismiss should be denied and the motion for preliminary injunction granted to the extent stated in this order.

## Motion to Dismiss

As the motion to dismiss raises issues going to the subject matter jurisdiction of the court, it is addressed first. In resolving the 12(b)(1) motion, the court has considered the evidence offered at the hearing, in addition to the complaint's allegations. *See* Holt v. U.S., 46 F.3d 1000, 1003 (10th Cir. 1995).

Defendants contend there is no "case or controversy" here within the meaning of U.S. Const. art. III, § 2. They challenge plaintiffs' standing to bring the claims involved here,[9] arguing that no injury has occurred or is imminent and that plaintiffs have no legally protected interest in the continued operation of these businesses such as might be the basis for a claim. Standing is a constitutional prerequisite to the court's jurisdiction. Bishop v. Smith, 760 F.3d 1070, 1088 (10th Cir. 2014). In order to have standing, plaintiffs must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the challenged action of the defendants, and (3) that it is likely that the injury will be addressed

---

[9]*It is unclear whether defendants challenge standing only as to the claim seeking a declaration of the "paraphernalia" statute's application to particular products or whether the challenge extends to the Due Process claim. However, as standing is a jurisdictional issue, the court is obliged to consider the issue sua sponte if there is a question as to it. See* Rector v. City & County of Denver, *348 F.3d 935, 942 (10th Cir. 2003).*

by a favorable decision. Awad v. Ziriax, 670 F.3d 1111, 1120 (10th Cir. 2012) (quotations omitted); *see also* Davis v. FEC, 554 U.S. 724, 733 (2008). The "injury in fact" must involve a concrete and particular injury that is either actual or imminent. Bishop, 760 F.3d at 1088.

The court concludes plaintiffs have shown the existence of a "case or controversy" and that they have standing to pursue their claims here. With respect to the request for a declaration as to the applicability of the CSA to their operations, plaintiffs have alleged that the statutory scheme does not afford them fair notice of what conduct is prohibited, in a manner that would discourage arbitrary enforcement. Further, plaintiffs are actually engaged in activity potentially covered by the statutory scheme. The allegations and evidence indicate that the DEA, and perhaps others, are focused on the activities of these plaintiffs and others who are in the same business, that the DEA and its agents have declined to provide guidance as to the potential application of the statutes to plaintiffs, and that some agents have endorsed an expansive reach of the statutes (*i.e.,* what is "paraphernalia") that puts plaintiffs' continued operations at risk. This showing is sufficient to make out the necessary "injury in fact" as to the vagueness claim. *See* Aid for Women v. Foulston, 441 F.3d 1101, 1110 (10th Cir. 2006).

Similarly, plaintiffs' showing is sufficient as to their Due Process claim. They have an obvious economic interest in the continued operations of their businesses.[10] They allege

---

[10]*Defendants appear to argue that only a "constitutional" interest can be the basis for standing. Government's Motion to Dismiss [Doc. #14] at 8-9. However, a broad range of interests can supply the necessary basis for injury in fact in the standing context. See* Assoc. of Data Processing Serv. Orgs. v. Camp, *397 U.S. 150, 154 (1970).*

6

that the DEA's enforcement or informational efforts directed to the landlords jeopardize their continued operation.[11] The evidence offered at the hearing supports the allegation.

To the extent defendants challenge the causation ("fairly traceable") element of standing on the basis that the DEA was just passing out information to the landlords, rather than threatening prosecution, their argument fails. The sending of the letters at the very least supports a permissible inference that the DEA was trying to cause the landlords to stop leasing to plaintiffs and to put them out of business. Further, the unchallenged testimony at the hearing was to the effect that, as to at least one landlord, agents followed up with a later contact to find out what steps the landlord had taken relative to plaintiffs after receiving the letter. That level of interest is inconsistent with simply passing out information. In any event, plaintiffs have made a sufficient showing of a causal connection between the DEA's conduct and the injury plaintiffs allege they are suffering.

There does not appear to be any real challenge to the third element necessary for standing. These defendants are persons in a position to initiate, conduct or control any enforcement efforts as to the pertinent statutes. Declaratory or injunctive relief directed to these defendants would be likely to remedy plaintiffs' injuries, if they are otherwise able to make out the claims they assert.

In sum, plaintiffs showing is sufficient to establish Article III standing.

---

[11]*Defendants' suggestion that plaintiffs are really seeking to assert the rights of the landlords is unpersuasive. Plaintiffs' complaint is plainly directed to the potential injury to plaintiffs' own interest, albeit by the government's alleged efforts involving the landlords.*

In addition to their jurisdictional challenge, defendants have moved under Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim. They do not challenge the factual sufficiency of the allegations, but rather focus on legal impediments to plaintiffs claims. In particular, they argue plaintiffs' vagueness challenge is foreclosed by Supreme Court precedent and that, as to the Due Process claim, plaintiffs have not alleged a liberty or property interest that the Constitution would protect.

Defendants argue that the Supreme Court's decision in Posters 'N' Things, Ltd. v. U.S., 511 U.S. 513 (1996) bars plaintiffs' vagueness challenge. In Posters, the court considered the constitutionality of 21 U.S.C. § 857 and the question of what constitutes "drug paraphernalia."[12] The petitioners were operators of a "full scale 'head shop'" who argued that the statute was unconstitutionally vague as applied to them. The Court rejected that challenge, concluding that, as to the items offered for sale by the petitioners, the statute was not unconstitutionally vague. It noted that substantially all of the items at issue there were ones which were *per se* drug paraphernalia based on items specifically listed in the statute. The Court recognized, though, that a "more serious" concern would exist where "multiple-use items" were concerned—items that have legitimate as well as illegitimate purposes— and that "a certain degree of ambiguity necessarily surrounds their classification." 511 U.S. at 526 (quoting U.S. v. Mishra, 979 F.2d 301, 309 (3rd Cir. 1992)). Here, it appears plaintiffs are selling, or seek to sell, a variety of items which fall into the "multiple-use" category.

---

[12]*21 U.S.C. § 857 has since been repealed and replaced with 21 U.S.C. § 863, which appears to be substantially the same in all respects relevant to this case.*

8

They allege that many of the items they seek to sell are ones appropriate for use in smoking legitimate tobacco products and that there has been a "significant increase in smoking other legal substances other than tobacco" since the passage of the CSA. Complaint [Doc. #1] at ¶ 40. Given the extent of "multiple-use" items alleged to be involved here, this case presents questions outside the central thrust of Posters. The court therefore concludes that, while Posters may give plaintiffs a steep hill to climb in making out their vagueness claim, it does not preclude it as a matter of law.

Defendants also argue that plaintiffs lack any constitutionally protected interest in the various properties they occupy, on the basis that they have not alleged the existence of any long-term leases giving them a recognized interest in the locations. In particular, defendants argue that the only property interest plaintiffs had, if any, was a tenancy at will, which according to State ex rel. Dept. of Transp. v. S & S Prop., 994 P.2d 75, 81 (Okla. Civ. App. 1999), is not constitutionally protected. Government's Motion to Dismiss [Doc. #14] at 23. The exact nature of plaintiffs' interest in the various locations is not spelled out in the complaint. Rather, it refers to the DEA's attempt to get plaintiffs' "landlords to terminate the tenancies and leases of the business" and to threats directed to landlords "who continue to honor their leases with Plaintiffs...." Complaint [Doc. #1] at ¶¶ 2 & 3. The court concludes these allegations are sufficient, as against a 12(b)(6) motion, to show a property interest subject to constitutional protection. And, though not directly pertinent in resolving a 12(b)(6) motion, this conclusion is consistent with what the evidence at the hearing showed. The evidence indicated that, prior to the letters being sent to the landlords, plaintiffs

had reached oral agreements with at least some of the landlords to remain in possession of their premises in exchange for a monthly payment of rent. Such agreements are evidence of a month-to-month tenancy. *See* Kester v. Disan Engineering Corp, 591 P.2d 344 (Okla. Civ. App. 1979) (concluding that an oral agreement to occupy premises in exchange for a specified monthly payment was a month-to-month tenancy, not an tenancy at will); *see also* Restatement (Second) of Property, Land. & Ten. § 1.5 (1977) ("Where the parties enter into a lease of no stated duration and periodic rent is reserved or paid, a periodic tenancy is presumed. The period thus presumed is equal to the interval for which rent is reserved or paid..."). This distinction is material because, as noted in the case relied on by the government, a tenancy at will is "less secure than a lease or *month to month tenancy*." S & S Prop., 993 P.2d at 80 (emphasis added). Other courts have recognized that constitutional protections will extend to month-to-month tenancies. *See e.g.,* Ruiz v. New Garden Twp., 376 F.3d 203, 206 (3d Cir. 2004) (distinguishing between month-to-month tenancies and tenancies at will to determine whether a property right existed); Devines v. Maier, 665 F.2d 138, 149 (7th Cir. 1981) (recognizing that month-to-month tenants are entitled to just compensation in eminent domain proceedings); Hite v. Field, 462 A.2d 393, 396 (Conn. Super. Ct. 1982) (having "no difficulty" in holding that month-to-month tenants "have property rights in the premises which are subject to constitutional protection"). In these circumstances, the court concludes that the complaint sufficiently states a property interest

that is subject to Due Process protection.[13]

Finally, defendants appear to argue that it is *legally impossible* for plaintiffs to obtain any interest in the properties at issue because acts had already occurred on the properties which gave rise to a right of forfeiture in the government, relying on 21 U.S.C. §§ 881(a)(7) and (h). That remarkable assertion raises a number of questions, but it is unnecessary to address all of them here, as the Supreme Court has already essentially rejected the main thrust of defendants' argument. In United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J., 507 U.S. 111, 122 (1993), the Court declared that forfeiture must be judicially determined before the government's rights vest in property. Here, there is no allegation in the complaint that a basis for forfeiture of the various tracts of real estate has been legally determined, nor, for that matter, was there any evidence of such a determination offered at the hearing. There is zero indication that forfeiture of the various tracts of real estate was ever sought, much less decreed by a court. In these circumstances, there is no basis for turning the government's *potential* interest in the various tracts into some sort of legal bar to plaintiffs acquiring a *present* interest in them.

The court concludes the motion to dismiss should be denied.

Motion for Preliminary Injunction

Plaintiffs seek entry of a preliminary injunction restraining the threat of, or the

---

[13]*Defendants also argue that harm to a person's reputation will not support a Due Process claim. In light of the court's conclusion that plaintiffs have alleged a sufficient basis for a Due Process claim grounded in their property interests, it is unnecessary at this point to resolve whether defendants' view of claims based on "reputational" harm is accurate or whether the claims involved here should be viewed as reputational in nature.*

11

institution of, civil forfeiture proceedings against the plaintiffs and the third-party landlords pending a final determination of plaintiffs' request for clarification of the legality of their inventory and operations. To obtain a preliminary injunction, the moving party must establish that: "(1) it is substantially likely to succeed on the merits, (2) it will suffer irreparable injury if the injunction is denied, (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction, and (4) the injunction would not be adverse to the public interest." Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009).

The Tenth Circuit has applied a relaxed "probability of success" requirement when the moving party has established that the other three factors "tip decidedly in its favor." Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003). However, this relaxed standard does not apply where the injunction sought would enjoin the enforcement of a statute. Nova Health Systems v. Edmondson, 460 F.3d 1295, 1298 n. 6 (10th Cir. 2006). Here, plaintiffs seek an order preventing enforcement of the civil forfeiture statutes pending completion of the case. They are therefore subject to the regular standard as to probability of success.

While the question is close, the court concludes plaintiffs have shown the necessary likelihood of success, as to at least the Due Process claim, which is the one potentially justifying the particular injunctive relief sought here.[14] The evidence at the hearing

---

[14]*If the issue turned on prospects for the "vagueness" claim, or the request for declaratory judgment as to the various items in plaintiffs' inventory, the result would likely be otherwise.*

demonstrated that they have now established businesses which they seek to operate. They have property interests in the inventory they acquired from the old Ziggy's operations and in the locations where the property is sold. They have an obvious interest in the ongoing operation of the businesses. A significant portion of the items plaintiffs now seek to sell are indisputably legal. As discussed above, these interests are sufficient to support a Due Process claim.

The evidence established that the use of the former Ziggy's locations is important to the success of plaintiffs' operations and that, absent those locations, the businesses are likely to fail. The evidence established that the DEA's letter and followup activities have interfered in a substantial way with plaintiffs' efforts to establish or maintain ongoing lease arrangements with the landlords of the various Ziggy's locations.[15] Further, and perhaps most importantly, the evidence established that, as to at least some of the landlords, the DEA's efforts went significantly beyond merely advising landlords of the potential

---

*Plaintiffs' reliance on authorities pre-dating and inconsistent with Posters, coupled with the nature of their request for declaratory relief, make it unlikely the court will grant the "vagueness" relief it seeks. It appears plaintiffs are, in effect, asking the court to make an anticipatory determination of what hundreds of items are "likely to be used" for or of what plaintiffs know about their prospective use. See Posters, 511 U.S. at 524; see also U.S. v. Doyle, 335 Fed. App'x. 736, 739 (10th Cir. 2009)(unpublished)("...the test under Posters 'N' Things focuses not on whether he knew that the items were drug paraphernalia under the law but on whether he knew that the items were 'likely to be used with illegal drugs.'").*

[15]*Defendants' argument that plaintiffs' real dispute is with the landlords was not supported by the evidence. Defendant's Response [Doc. #8] at 19 (pagination based on the CM/ECF page number). Although it appears some landlords asserted other grounds for potential lease terminations, the testimony at the hearing was sufficient to establish that most of the landlords were willing to proceed with plaintiffs as tenants but for the DEA's letter and efforts.*

application of the law. Rather, the letters were such that a landlord could reasonably be expected to view them as a threat of prosecution, or tantamount to that. Further, so far as the evidence offered at the hearing indicated, the letters were sent after the operations at the various sites had been taken over by the new entities (plaintiffs) and after the DEA presumably knew of that change, and, most significantly, DEA agents followed up approximately a month after the letters were sent to inquire as to what steps the landlords had taken in response to the letters. These actions suggest that the DEA was "leaning" on third parties in an effort to force out of business entities it was either unwilling or unable to confront in a more direct manner. While the parties' submissions have done little to flesh out the parameters of a potential Due Process violation in these circumstances,[16] the court concludes a sufficient showing has been made of likelihood of success.

Plaintiffs' evidence is sufficient to establish that it will experience irreparable harm if the injunction is not granted. The evidence established that the DEA's letter and contacts have already caused some of plaintiffs' landlords to terminate their lease arrangements. It also established that the loss of the lease locations jeopardized the existence of the companies. Even though financial losses are ordinarily compensable in money damages, a showing that a company may be forced out of business completely can constitute the necessary showing of "irreparable injury." Tri-State Generation & Transmission Ass'n, Inc.

---

[16]*Defendants' arguments were directed principally to issues like standing and the presence or absence of a property or liberty interest, rather than to the showing necessary to define a constitutional violation in these circumstances. Plaintiffs' submissions did not include authorities squarely addressing the issue either.*

v. Shoshone River Power, Inc., 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."). Further, as defendants essentially conceded at the hearing, the application of the doctrine of sovereign immunity likely precludes any monetary recovery against the government arising out of these circumstances. Finally, the court is unpersuaded by defendants' argument that plaintiffs are seeking only retrospective relief, and that prospective injunctive relief is unwarranted. The "followup" contacts with landlords by DEA agents, coupled with the evidence of a broader enforcement effort against "smoke shops" generally, suggests the letters were not one-time, past events, but are part of an ongoing law enforcement effort.

Plaintiffs have also established the third element necessary for injunctive relief. They have shown that the DEA's efforts to date have caused the loss of some leases, that all remaining leases are threatened, and that loss of additional leases threatens the existence of the two companies.[17] The threatened injury to plaintiffs is substantial. Defendants obviously have a substantial interest in not having the full range of their law enforcement options limited, and that interest would be particularly strong if the court were to grant the full relief plaintiffs seek—the entry of an injunction against forfeiture proceedings against the landlords and plaintiffs. However, the limitation on defendant's enforcement options is significantly less if, as with the TRO previously entered, the relief is limited to actions against the

---

[17]*The court is particularly underwhelmed by defendants' argument that, since plaintiffs paid only what they viewed as 20% of the inventory's market value, they have no rights, or at least no prospect of real harm, now.*

15

landlords. Further, it is significant that plaintiffs do not seek to preclude defendants from pursuing any <u>criminal</u> enforcement options they may think appropriate. Rather, they seek restraint of only potential <u>civil forfeiture</u> remedies during the course of the case. The court concludes the potential injury to plaintiffs from not entering an injunction of appropriate scope outweighs the countervailing injury to defendants.

Finally, the court concludes, on the present showing,[18] that entry of an injunction as described below would not be contrary to the public interest. There is, of course, a substantial public interest in the enforcement of the nation's drug laws and the important interests those laws are designed to protect. Any limitation, however temporary, on the authority of the executive branch to exercise the full range of enforcement options available to it is not to be taken lightly. And the practical difficulties in policing the limitations on "drug paraphernalia," with all the issues arising from multiple uses of many of the items involved (not to mention apparently "new" entities operating from the same premises, under substantially the same name), is no doubt frustrating to law enforcement officials. However, the authority of the government to attack the problem of illegal drugs and related paraphernalia does not give it leave to employ any means it can. Frustration does not warrant departure from standards of law that put the resolution of these questions—through either criminal proceedings or civil forfeitures proceedings—before a court. The government may not attack what it views as illegal activity by simply putting someone out of business,

---

[18]As noted above, <u>all</u> the evidence at the hearing came from the plaintiffs.

16

through "leaning" on their landlords or customers or other backdoor means. Based on the evidence presented to the court to date, plaintiffs can plausibly argue that is happening as to them. The court concludes entry of a limited injunction as referenced below is not contrary to the public interest.

For the reasons indicated, entry of a preliminary injunction is warranted here. However, consistent with the reasons indicated at the time of entry of the TRO, the injunction will be limited to civil forfeiture proceedings directed to the landlords. The harm to which this injunction is principally directed is that which flows to plaintiffs from their landlords receiving what the landlords likely (and plausibly) view as threats of punitive action if they continue to deal with plaintiffs, and under circumstances where plaintiffs have no other meaningful means of redress. If the government chooses to pursue plaintiffs directly through appropriate criminal or civil proceedings, it may do so.

## Conclusion

For the reasons stated above, defendants' motion to dismiss [Doc. #14] is **DENIED**. Plaintiffs' motion for preliminary injunction [Doc. #2] is **GRANTED** as follows: until further order of this court, defendants and their agents are preliminarily **ENJOINED** from (1) issuing any warnings or letters to, or otherwise contacting (other than through discovery in this case), the persons or entities who/which are the owners/lessors of the various premises where plaintiffs were operating as of the commencement of this case; and (2) pursuing any civil forfeiture proceedings against the indicated owners/lessors.

17

As there are no apparent costs or monetary damages which defendants will incur by reason of entry of this order, no bond or other security will be required of plaintiffs.

**IT IS SO ORDERED**.

Dated this 18th day of August, 2015.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE